# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

**COMMODITY RESOURCES, INC.,** a
Michigan Corporation,

No. 2:12-cv-10173

                Plaintiff,                Hon. Gerald E. Rosen

vs.

**CERTAIN UNDERWRITERS AT LLOYDS,
LONDON,** a Foreign Corporation,

                Defendant.

_____/

## OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

This action was removed on diversity jurisdiction from Wayne County Circuit Court on January 13, 2012. Plaintiff Commodity Resources, Inc. alleges that Certain Underwriters at Lloyd's, London ("Defendant") failed to make full payment of Plaintiff's insurance claim under MCL § 500.2001, *et seq.* -- the Uniform Trade Practices Act. The parties have filed cross-motions for summary judgment.

## II. FACTUAL BACKGROUND

This case arises out of a fire that destroyed Plaintiff's building on March 19, 2011.  There is no dispute that the building was insured by Defendant at the time of the fire for $1,000,000.  The only dispute is the amount due to Plaintiff under the terms of its insurance contract with Defendant.

### A.    The Building Purchase and Insurance Policy

On December 15, 2008, Plaintiff purchased a 65,000 square foot building for $70,000.  Plaintiff subsequently invested $372,695.09 into the building for improvements and post-fire security, for a total investment of $442,695.09.

On July 25, 2010, Defendant issued a $1,000,000 Actual Cash Value ("ACV") insurance policy for the building.  The payment provision provided:

E.    Loss Conditions

* * * *

7.    Valuation

We [Defendant][1] will determine the value of Covered
Property in the event of loss or damage as follows:

---

[1] *See* Insurance Policy, ¶ 2, which states: "Throughout this policy the words 'you' and 'your' refer to the Named Insured shown in the Declarations.  The words 'we', 'us' and 'our' refer to the Company providing this insurance."

> a.  At actual cash value as of the time of loss or
>     damage, except as provided in b., c., d. and e.
>     below . . . .[2]

Defendant was offered the opportunity to purchase "Replacement Cost"

insurance, but declined that option.  The "Replacement Cost" provision,

contained in section "G. Optional Coverages,"  provides:

> G.    Optional Coverages
>
> If shown as applicable in the Declarations, the following Optional
> Coverages apply separately to each item.
>
> * * * *
>
> 3.    Replacement Cost
>
> a.  Replacement Cost (without deduction for
>     depreciation) replaces Actual Cash Value in the
>     Loss Condition, Valuation, of this Coverage Form.

The significance of Plaintiff's decision not to purchase this coverage will

soon become apparent.

Finally, the policy contains a section governing the process for resolving

valuation disputes.  Section E(2) -- titled "Appraisal" -- describes the agreed

upon mechanism for settling any dispute over the amount of loss.  In the

event that the parties contest the appraisal, either party "may make written

---

[2] It is uncontested that sections b, c, d, and e are inapplicable to a resolution of this
suit.

demand for an appraisal of the loss." Through this process, each party would select a competent and impartial appraiser, and the appraisers together would select an umpire. If the two appraisers, or one appraiser and the umpire, come to an agreement on the value of the property, that decision will be binding on the parties. However, under that provision, Defendant retained the right to deny the claim entirely.

**B.    March 19, 2011 Fire and Subsequent Appraisal**

On March 19, 2011, Plaintiff's building was completely destroyed by a fire. Defendant retained an appraiser to determine the Actual Cash Value ("ACV") of the property at the time of loss. Under the Broad Evidence Rule, the appraiser applied two different approaches -- the Cost Approach and Market Value approach -- to arrive at the ACV of the property. As the appraiser explained in his affidavit, the Cost Approach calculates ACV as "Replacement Cost less the Accrued Depreciation on the property." Accrued depreciation is calculated by (i) determining the Replacement Value New (RVN) of three comparable properties that were sold around the time of the Plaintiff's loss, (ii) subtracting the actual sale price of these three properties from the RVN, and (iii) dividing the accrued depreciation percentage by the estimated effective age of the properties. Based on this formula, the appraiser determined that the average annual depreciation rate for

4

comparable buildings in the area was 1.75%.  When the appraiser applied this formula to Plaintiff's property -- which he estimated to have a RVN of $4,331,762[3] -- the Cost Approach analysis yielded an ACV of $161,691.

Defendant's appraiser also utilized the Market Value Approach, which looks at the sale of comparable properties to estimate the ACV and does not account for depreciation.  This approach valued Plaintiff's building at $163,000.  Based on these appraisal methods, Defendant paid Plaintiff $156,961 for the damage to its property, which is the ACV under the Cost Approach less Plaintiff's $5,000 policy deductible.

Plaintiff, however, claims that the ACV of the building is "over $3,000,000," and consequently demands that Defendant pay out the full value of the $1,000,000 policy.  In support of this amount, Plaintiff submits two exhibits -- unsupported by affidavits -- which state: (i) that the Replacement Cost of the building is $3,960,092; (2) that the Whole Loss and Damage from the fire was $3,012,319; and (iii) that the Actual Cash Value of the property was $2,970,069.  While Plaintiff states that its ACV estimate was calculated using the "Replacement Cost less Depreciation" formula, it has provided no affidavits in support of the exhibit which purports to calculate the

---

[3] It is worth noting that Defendant's RVN -- $4,331,762 -- is actually $371,670 *higher* than the estimate asserted by Plaintiff.  Of course, as noted, Plaintiff declined to purchase "Replacement Cost" insurance.

Replacement Cost of the building, and no evidence at all indicating how it

calculated Depreciation,[4] which, of course, is essential to understanding its

ACV estimate.

---

[4] While it is not entirely clear how Plaintiff's asserted mandatory method of calculation differs from the Defendant's "Cost Approach," the key difference seems to be that the Cost Approach utilizes the current market value of comparable properties to calculate Depreciation, while Plaintiff's method (presumably) utilizes a more theoretical method, such as straight-line depreciation. The effect of this difference is that properties in areas that have been hit with sudden and severe declines in market value may depreciate at a much higher rate under the Cost Approach than under a theoretical approach.

However, the Court believes it unlikely that such a difference alone would justify the wide variance between Plaintiff's and Defendant's ACV estimates. Using Plaintiff's numbers and a straight-line depreciation formula, the building has a RVN of $3.96MM and an Actual Cash Value of $2.97MM, meaning that the Plaintiff claims Depreciation of ~$990,000. Assuming *arguendo* that the appraiser's statement that the building had an effective age of 55 years (the actual age is irrelevant, as the years are simply a constant in this formula) is accurate, this means that Plaintiff is assuming an annual depreciation of 0.455%. This is significantly lower than the 1.75% rate of depreciation observed in comparable properties by Defendant's appraiser. Further, Plaintiff's depreciation rate does not stand up to scrutiny when compared against Plaintiff's own purchase of the property for $70,000. Again accepting Plaintiff's RVN of $3.96MM -- and using Plaintiff's purchase price of $70,000 -- the property at issue in this case depreciated at an annual rate of 1.82% over its 55 year estimated life, far closer to Defendant's estimate than Plaintiff's. Thus, for this property, in this area of Detroit, the actual rate of depreciation seems to be in the neighborhood of 1.75%, as Defendant's appraiser suggested. It does not seem appropriate to allow Plaintiff to apply an unrealistically low depreciation rate to property in a depressed area simply to receive a windfall profit (in this case, $558,000 profit on a $442,000 investment) when something goes wrong, particularly in view of the fact that it declined the higher coverage option.

**C.     Dispute over Meaning of "Actual Cash Value"**

On these facts, Plaintiff requests summary judgment in its favor on the grounds that ACV, as used in the contract and under Michigan law, can only mean "Replacement Cost less Depreciation," as calculated by Plaintiff. Alternatively, Plaintiff asks this Court to deem the term ACV "ambiguous" and embrace Plaintiff's understanding under the canon that contracts are construed in favor of the non-drafting party.  Defendant also requests summary judgment, arguing that ACV is not ambiguous because Michigan law requires the use of a variety of metrics -- including, but not limited to, Replacement Cost less Depreciation -- to arrive at the ACV of the damaged property.

## III. DISCUSSION

**A.     Summary Judgment Standard**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To establish that a fact cannot be disputed, the movant must either (i) cite to particular materials in the record -- such as documents or affidavits -- or (ii) show that the materials cited do not establish the presence of a genuine dispute.  *See* Fed. R. Civ. P. 56(c)(1)(A-B).  Additionally, "[a] party may object that the material cited to

support . . . a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Evid. 56(c)(2).

Both Plaintiff's motion and Defendant's cross-motion for summary judgment turn on the meaning of "Actual Cash Value" in Plaintiff's insurance policy. Because the "[c]onstruction of a contract to ascertain the intent of the parties presents a question of law," summary disposition is appropriate in this case. 75A Am. Jur. 2d Trial § 678.

## B.    Analysis

### 1.    Defendant Did Not Violate the Terms of the Policy

Plaintiff claims that Defendant violated the terms of the policy by "failing to pay the full actual cash value" of Plaintiff's loss. In interpreting an insurance policy, the Court must look to the terms of the policy itself and give effect to the parties' intention as expressed in the terms of the contract as a whole. *Auto-Owners Ins. Co. v. Churchman*, 440 Mich. 560, 567, 489 N.W.2d 431, 433-34 (1992). The Court must enforce an unambiguous, completely integrated contract "according to its plain meaning, without looking to extrinsic evidence." *Society St. Vincent Archdiocese v. Mt. Hawley Ins.*, 49 F. Supp. 2d 1011, 1016 (E.D. Mich. 1999). However, just because an insurance policy "does not define a relevant term does not render the policy ambiguous." *Henderson v. State Farm Fire and Cas. Co.*, 460 Mich. 348, 354, 596 N.W.2d

190 (1999) (internal citation omitted).  Rather, reviewing courts must

interpret the terms of a contract in accordance with their commonly used

meanings.  *Group Ins. Co. of Michigan v. Czopek*, 440 Mich. 590, 596, 489

N.W.2d 444, 447 (1992).

Thus, the most logical place to begin this analysis is with the text of the

policy itself.  The relevant coverage provision states as follows:

E.    Loss Conditions

\* \* \* \*

7.    Valuation

**We** [Defendant] will determine the value of Covered
Property in the event of loss or damage as follows:

a.  At actual cash value as of the time of loss or
damage, except as provided in b., c., d. and e.
below . . . .

(emphasis added).

What is immediately apparent from this provision is that the policy

vests Defendant -- not Plaintiff -- with the unilateral power to determine the

ACV at the time of loss or damage.  Further, Section E(2)[5] -- titled

"Appraisal" -- provides the agreed upon mechanism for any dispute over the

amount of loss.  Thus, the plain terms of the policy make it clear that (i) the

Defendant will determine the actual cash value of the property and (ii)

---

[5] Discussed *supra*, § II.A.

9

Plaintiff can contest the accuracy of Defendant's valuation by submitting the cause to a pair of appraisers.

The import of these observations is that Defendant has complied -- at least facially -- with the provisions of the policy. As required, Defendant "determined the value of Covered Property" at "actual cash value." Further, by failing to seek an appraisal, as required by the contract, Plaintiff has indicated that another appraiser, using the same methodology, would not come to a more favorable valuation. Thus, if Defendant has actually complied with the plain language of the policy, Plaintiff's claim should be dismissed.

However, the meaning of the policy is precisely what Plaintiff contests. If Actual Cash Value -- under the plain language of the policy -- must be calculated as "Replacement Cost less Depreciation," then Defendant has not acted in accordance with the policy. If that term requires the Broad Evidence Rule -- as asserted by Defendant -- then Defendant has acted in accordance with the policy. Consequently, resolution of this case hinges largely on the meaning of "Actual Cash Value," which is not defined in the policy, and whether that term is ambiguous as a matter of law in the context of this policy.

a.    When "Actual Cash Value" is Undefined by the Plain
Language of an Insurance Policy, Michigan Law
Requires Use of the Broad Evidence Rule

Although the policy does not specifically define Actual Cash Value, both parties argue that the term has been unambiguously defined under Michigan law. While Plaintiff claims that "the Michigan Supreme Court has specifically held that actual cash value means replacement cost less depreciation," Defendant contends that Michigan law requires the use of the Broad Evidence Rule when ACV is not defined in an insurance policy.

Defendant correctly states the binding rule of law in this Circuit and the State of Michigan. In *Evanston Ins. Co. v. Cogswell Properties, LLC*, the Sixth Circuit stated that when "the Policy does not define actual cash value, all evidence relevant to an accurate determination of the Property's value must be considered." 683 F.3d 684, 688 (6th Cir. 2012) (*quoting Evanston Insurance Co. v. Cogswell Properties, LLC*, 2009 U.S. Dist. LEXIS 4868, Case No. 1:08-cv-475, Dkt. #27 (W.D. Mich. Jan. 23, 2009)). Embracing the district court's interpretation of Michigan law, the Court emphasized that "Michigan courts recognize that no set method of valuation is necessary within the appraisal context. . . . Market value, replacement value, and other means of valuation are merely guides, rather than shackles compelling strict adherence." *Id.* (internal quotations and citations omitted). The Broad Evidence Rule is particularly important when (i) "replacement value minus

11

depreciation and market value yield vastly disparate valuations" -- making it less likely that a single valuation method will establish an accurate ACV -- and (ii) when appraising "relatively illiquid property such as real estate." *Id.* Thus, when ACV is left undefined in a real estate insurance contract, "Michigan law favors the consideration of all evidence relevant to an accurate determination of the Property's value." *Id.*

Plaintiff's assertion that Michigan law defines Actual Cash Value as "Replacement Cost less Depreciation" fails to appreciate this crucial distinction.  When the Supreme Court of Michigan made that statement in *Smith v. Michigan Basic Property Ins. Ass'n*, 441 Mich. 181, 197, 490 N.W.2d 864, 871 n.28 (1992), it was speaking to the ACV of *personal* property.  The full statement of law reads as follows: "'Replacement cost' means a reasonable estimate of the cost of replacing on the market an item of personal property.  'Actual cash value' means replacement cost less depreciation." *Id.* The distinction between personal property and real property is important, as personal property -- such as clothing and furniture -- is more liquid and readily available than real estate, thus making its value easier to quantify. The Court therefore finds Plaintiff's reliance on *Smith* and similar cases inapposite in light of the Sixth Circuit's opinion in *Evanston*, which specifically addresses ACV in the context of real estate.  683 F.3d at 688 ("This is particularly true of relatively illiquid property such as real estate.

In the absence of a contractual definition of 'actual cash value,' Michigan law favors the consideration of all evidence relevant to an accurate determination of the Property's value.") (internal citations and quotations omitted).

According to Plaintiff, however, the language of *Evanston* limits the Broad Evidence Rule to the "appraisal context." *See Evanston*, 683 F.3d at 688 ("Michigan courts recognize that no set method of valuation is necessary *within the appraisal context*.") (emphasis added). Plaintiff finds support for this position in *Jiminez v. Allstate Indem. Co.*, which held that "[t]he defendant's reliance on the broad evidence rule is misplaced. The broad evidence rule is not relevant in considering the language of the insurance contract and determining what the parties agreed to with regard to calculating the ACV." 2009 WL 440958, at *1, *2 (E.D. Mich. Feb. 23, 2009) (Murphy, J.). The Court notes that *Jiminez* was decided prior to the Sixth Circuit's decision in *Evanston*, and, therefore, the Judge in *Jiminez* did not have the benefit of the Sixth Circuit's reasoning in *Evanston*. But beyond this, neither Plaintiff nor the court in *Jiminez* provide any rationale for why the Broad Evidence Rule should be restricted to the appraisal context. Indeed, this Court believes such a distinction would be arbitrary and problematic. Since both the appraiser and the trier of fact must act within the terms of the policy, requiring the Broad Evidence Rule in the appraisal context, while demanding that judges and juries only consider "Replacement

Cost less Depreciation," creates an interpretive scheme that is not only in tension with itself, but also provides no guidance to parties in their attempt to reduce the terms of their agreement to paper. Thus, here, the Court finds that the Sixth Circuit's later decision in *Evanston* requires the application of the Broad Evidence Rule whenever the term Actual Cash Value is not otherwise defined in an insurance contract.

### b. The Plain Language of the Policy is Not Ambiguous because it Does Not Reasonably Suggest an Alternative Understanding of Actual Cash Value

This determination, however, does not end the inquiry into the meaning of "Actual Cash Value" in Plaintiff's contract. Because the Court must effectuate the intent of the parties as expressed in the contract as a whole, *Churchman*, 440 Mich. at 567, the Court must now determine whether the plain language of the policy reasonably suggests that the parties may have contemplated a specific, alternative definition. If an alternative reading is reasonable, the contract is ambiguous. *Farm Bureau Mut. Ins. Co. v. Blood*, 230 Mich. App. 58, 61-62, 583 N.W.2d 476, 478 (1998) (citations omitted) ("An insurance contract is ambiguous if, after reading the entire contract, its language reasonably can be understood in differing ways."). Under Michigan law, ambiguity in a contract is construed against the drafter. *See State Farm Mut. Auto. Ins. Co. v. Enterprise Leasing Co.*, 452 Mich. 25,

38-39, 549 N.W.2d 345, 351 (1996) (holding that where an insurance contract is ambiguous, it "should be construed against its drafter and in favor of coverage."). However, a Court cannot create ambiguity where none exists. *Allstate Ins. Co. v. Keillor*, 450 Mich. 412, 417, 537 N.W.2d 589, 591 (1995). Thus, because the undefined term "Actual Cash Value" requires use of the Broad Evidence Rule under Michigan law, the Plaintiff must demonstrate that the plain terms of the policy reasonably indicate that its suggested alternative definition -- *i.e.*, that ACV can only be calculated as Replacement Cost less Depreciation -- could have been intended by the parties.

As a preliminary matter, Plaintiff points to two cases in this district that have found the term "Actual Cash Value" ambiguous. *See Beard v. Allstate*, 2011 WL 3330567, at *1 (E.D. Mich. Aug. 3, 2011); *Jiminez v. Allstate Indem. Co.*, 2009 WL 440958, at *1 (E.D. Mich. Feb. 23, 2009) (Murphy, J.). Those cases are inapposite for two reasons. First, both *Beard* and, as noted, *Jiminez* were decided prior to the Sixth Circuit's decision in *Evanston*, and were consequently not informed by its holding. But more importantly, the policies at issue in those cases both clearly contemplated that Depreciation was a component of ACV. In *Beard*, the policy explicitly stated that Depreciation was part of ACV. 2011 WL 3330567, at *7 ("Actual Cash Value. If you do not repair or replace the damaged, destroyed or stolen property, payment will be on an actual cash value basis. This means there

may be a deduction for depreciation."). Similarly, *Jiminez* found the policy ambiguous because the "contract language . . . does implicitly contemplate the possibility that the AVC [sic] could be calculated by plaintiff's method, the cost of repair or replacement minus depreciation, because whenever the ACV is discussed in the contract, the language mentions the possibility of a depreciation deduction." 2009 WL 440958, at *2.

Unlike the policies in *Beard* and *Jiminez*, the "Loss Conditions - Valuation" provision in Plaintiff's contract makes no reference to Depreciation. Without plain language tying ACV to Depreciation, these cases provide no basis whatsoever to disregard the Sixth Circuit's determination that "Actual Cash Value," when undefined, requires the application of the Broad Evidence Rule.

While Plaintiff acknowledges that there is no reference to Depreciation in the definition of ACV itself, Plaintiff claims that the other provisions in the policy clearly indicate, "by singular implication," that ACV must mean "Replacement Cost less Depreciation." Plaintiff argues that ACV is defined by implication in article G(3) of the contract, labeled "Optional Coverages - Replacement Cost." The article provides as follows:

G.     Optional Coverages

If shown as applicable in the Declarations, the following Optional Coverages apply separately to each item.

* * * *

3.     Replacement Cost

a. Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Loss Condition, Valuation, of this Coverage Form.

Plaintiff does not argue that it is covered by this provision, but rather that this language necessarily defines "Actual Cash Value" in article E(7), which describes Plaintiff's coverage. Plaintiff reasons that because "Replacement Cost (without deduction for depreciation)" replaces "Actual Cash Value" in the "Optional Coverages - Replacement Cost" provision, this necessarily implies that "Actual Cash Value" must be defined as "Replacement Cost *with* a deduction for depreciation" in Plaintiff's "Loss Conditions - Valuation" provision.

This analysis is unpersuasive for three reasons. To begin with the obvious, if the parties intended ACV to be defined exclusively as "Replacement Cost less Depreciation," the parties certainly would have included that definition in the contract provision itself, rather than leaving such an explicit definition to the dubious "reverse inference" reasoning proposed by Plaintiff.

17

Second, as a matter of contract construction, courts are prohibited from adopting an interpretation that renders portions of a contract nugatory. *Fresard v. Michigan Millers Mut. Ins. Co.*, 414 Mich. 686, 694, 327 N.W.2d 286, 289 (1982). Under Plaintiff's definition of ACV ("Replacement Cost less Depreciation"), "Replacement Cost" must be without Depreciation; otherwise, subtracting Depreciation would have no effect on ACV (*i.e.*, if Depreciation has already been removed from Replacement Cost, there is no need to subtract Depreciation to reach the ACV; Replacement Cost itself would equal ACV). Thus, "Replacement Cost" is, by necessity, a pre-Depreciation value. When this understanding is applied to the policy's definition of "Replacement Cost," however, it renders the definition redundant. If Replacement Cost must be a pre-Depreciation value -- as is necessary under Plaintiff's understanding of ACV -- then the parenthetical "(without deduction for depreciation)" is unnecessary to effectuate a clear understanding of the contract; the term "Replacement Cost" alone would suffice. For the "Replacement Cost" clause to imply what Plaintiff suggests it implies, it would have to read: "Replacement Cost (*Actual Cash Value* without deduction for depreciation) replaces Actual Cash Value in the Loss Condition, Valuation, of this Coverage Form," thereby indicating that the Actual Cash Value is understood to incorporate Depreciation. Since Plaintiff's asserted

18

definition would create redundancy, it cannot be said that the contract unambiguously embraces Plaintiff's preferred definition of ACV.

Finally, Plaintiff's argument that the definition of "Replacement Cost" informs the definition of "Actual Cash Value" begs the question. Without Plaintiff's implicit assumption that "Replacement Cost less Depreciation" is the definition of Actual Cash Value, there is no logical relation between the two terms besides the fact that one replaces the other. This is insufficient to draw any sort of implication. For example, if one were to purchase "Apples" under a policy that provided the option to purchase "Oranges" instead -- *i.e.*, the oranges would *replace* the apples under the option -- one could hardly argue that such a term necessitates any relation in form between the two items. Rather, it would simply mean that oranges take the place of apples if that option is exercised. Similarly, if the definition for ACV is blank -- as the contract indicates -- then there is no reason to think that the definition of Replacement Value has any bearing on its meaning. It is only by assuming a relationship between these two terms at the outset of its analysis that Plaintiff is able draw any inferences between these two terms. Just as the replacement of apples with oranges does not create a derivative relationship between the two items, the replacement of "Actual Cash Value" with "Replacement Cost" does not dictate that one definition informs the other.

19

As the plain language of the policy offers no evidence that the parties intended Actual Cash Value to carry a specific, alternative definition, the term can only be reasonably understood as undefined. Consequently, Defendant acted in compliance with Michigan law and the terms of the policy when it utilized the Best Evidence Rule to calculate the Actual Cash Value of Plaintiff's building at the time of loss.

### 2.    Plaintiff has Provided Insufficient Evidence to Support its Asserted Damages

Even if the Court were inclined to adopt Plaintiff's definition of ACV, summary judgment in its favor would remain inappropriate because Plaintiff has failed to present any admissible evidence to support its claim of damages exceeding $3,000,000. "The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (citing *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). To satisfy this burden, Plaintiff offers two documents -- Exhibit 5 and Exhibit 6 -- which seek to demonstrate Plaintiff's loss.

20

In order for the Court to consider these exhibits, however, they must first be authenticated, as "unauthenticated documents do not meet the requirements of Rule 56[]." *Alexander*, 576 F.3d at 558. "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Because neither of the exhibits offered in support of Plaintiff's claim have been authenticated, Plaintiff has failed to establish the basic evidentiary foundation for these exhibits. 2 Lane Goldstein Trial Technique § 12:15 (3d ed.) ("Without sufficient evidence of authenticity, the foundation for the exhibit fails."). As these exhibits are the only evidence offered in support of Plaintiff's asserted damages, its request that this Court order Defendant to pay the full value of the insurance policy must be denied.

Turning to the exhibits themselves, Exhibit 5 -- titled "Calculator Cost Form" -- contains a set of estimate tables which purport to calculate the cost per square foot of Plaintiff's property, arriving at a Replacement Cost of $3,960,092.00. It also contains several lists, including: (i) Costs Not Included (*e.g.*, landscaping and designer fees); (ii) Equipment List (*e.g.*, Paper Shredder and Large Material Hydraulic Shear); and (iii) Improvements (*e.g.*, Glass Block Windows and Replaced Bathroom Fixtures). These lists are not accompanied by any pricing information.

21

Federal Rule of Civil Procedure 56(c)(4) requires that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Exhibit 5 fails all of these criteria. First, while the document indicates that the survey was made by "GMAI," there is no indication of what GMAI is or, more importantly, whether GMAI had personal knowledge of the details in the report or relied on information provided by Plaintiff. A "declaration itself must contain facts showing the declarant's connection with the matters stated therein, establishing the source of his or her information." FEDERAL CIVIL PROCEDURE BEFORE TRIAL § 12:59.1 (William W Schwarzer, et al. eds., 2012). Further, Exhibit 5 is neither signed nor notarized, and therefore contains no attestation as to its accuracy. *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990) ("[T]he purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues.").

Second, the Replacement Cost calculation constitutes hearsay not falling within any exception, as it is a written declaration made outside of court and offered to prove the Replacement Cost of Plaintiff's property. *See* Fed. R. Evid. 801-03.

Finally, without any information on whether the declarant has personal knowledge of the premises -- or who the declarant is -- it is impossible to determine whether the declarant was competent to offer testimony on the Replacement Cost of Plaintiff's property.  For all these reasons, Exhibit 5 is not admissible and cannot support Plaintiff's motion for summary judgment.

Exhibit 6 -- titled "Sworn Statement in Proof of Loss: Business Personal Property" -- suffers from the same fatal flaws.  Although Exhibit 6 is a notarized statement by Plaintiff asserting (i) the Actual Cash Value of the property at the time of the loss; (ii) the Whole Loss and Damage; and (iii) the amount claimed under the insurance policy, it does not comply with the requirements of Rule 56(c)(4).  Like Exhibit 5, Exhibit 6 does not demonstrate that Plaintiff's estimates were based upon personal knowledge.  Instead, Exhibit 6 merely lists the finalized ACV and Whole Loss and Damage estimates, without indicating how the Plaintiff came to those values. "Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009); *see also Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004) (finding that "conclusory statements" unsupported by specific facts will not permit a party to survive summary judgment); *Doren v. Battle Creek Health System*, 187 F.3d 595, 598-99 (6th

Cir. 1999) (holding that affidavits that contained no "specific facts" but "are merely conclusory, restating the requirements of the law . . . cannot create a genuine issue of material fact sufficient to defeat summary judgment").

Further, Plaintiff's written assertions regarding the ACV of the property are inadmissible as both (i) hearsay not falling within any exception under Fed. R. Evid. 801-03 and (ii) an impermissible lay witness opinion under Fed. R. Evid. 701. Plaintiff's statement that the ACV of the property was $2,970,069 was made out of court and -- as would be required to support a motion for summary judgment -- is offered to prove the truth of that fact. Fed. R. Evid. 801-03. Alternatively, it would be an inadmissible opinion under Rule 701, which forbids opinion testimony based upon technical or specialized knowledge. Finally, Exhibit 6 fails to demonstrate that the declarant is competent to testify on the matter stated, as simply owning property is an insufficient basis to create expertise in the field of insurance appraisal.

Thus, even if Plaintiff were to prevail on the definition of ACV, it has submitted insufficient evidence to support its request that this Court require Defendant pay the full value of the policy. Consequently, Plaintiff's request for summary judgment must be DENIED irrespective of whether ACV is ambiguous under the terms of the contract.

## IV. CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment is DENIED.

IT IS FURTHER ORDERED that Defendant's Cross-Motion for Summary Judgment is GRANTED.

**IT IS SO ORDERED.**

Dated:  February 19, 2013          s/Gerald E. Rosen
                                   GERALD E. ROSEN
                                   CHIEF JUDGE, UNITED STATES
DISTRICT COURT


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, Tuesday, February 19, 2013, by electronic and/or ordinary mail.

s/Julie Owens
Case Manager, (313) 234-5160